UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRANCIS WILSON,                                         :

               Plaintiff,               :              14 Civ. 9207 (AJP)

      -against-                    :              **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of                     :
Social Security,
                                :
              Defendant.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

            Francis Wilson, represented by counsel, brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of

Social Security (the "Commissioner") denying him Disability Insurance Benefits ("DIB").  (Dkt. No.

2: Compl.)  Presently before the Court are the parties' cross-motions for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 14: Wilson Motion; Dkt. No. 18: Gov't Motion.)  The

parties have consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

(Dkt. No. 11.)

            For the reasons set forth below, Wilson's motion for judgment on the pleadings (Dkt.

No. 14) is GRANTED to the extent of remanding the case to the Commissioner for further

proceedings consistent with this Opinion.  The Commissioner's motion for judgment on the

pleadings (Dkt. No. 18) is DENIED.

**FACTS**

**Prior Proceedings**

Wilson applied for DIB on May 22, 2012, alleging disability since January 29, 2012. (Dkt. No. 12: Administrative Record ("R.") 103.)  The Social Security Administration ("SSA") initially denied Wilson's application.  (R. 29-36, 51-56.)  On June 10, 2013, Wilson had a hearing before Administrative Law Judge ("ALJ") Michael Friedman.  (R. 39-50.)  On June 27, 2013, ALJ Friedman denied Wilson's claim.  (R. 16-25.)  On October 10, 2014, the Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.  (R. 1-6.)  The period at issue for Wilson's application runs from January 29, 2012, when Wilson alleged he became disabled, through June 27, 2013, the date of ALJ Friedman's decision.  (R. 39.)

**Non-Medical Evidence**

Wilson was born in January 1955 and was between fifty-seven and fifty-eight years old during the period at issue.  (R. 29, 103.)  Wilson completed four years of college.  (R. 120.) Wilson's past relevant work included over thirty-seven years of employment at the New York City Human Resources Administration, most recently as a staff analyst.  (R. 42, 120.)  Wilson's work included policy and planning, reports, analysis, budgeting and proofreading of documentation.  (R. 42, 121.)  Wilson retired on January 29, 2012.  (R. 42, 119.)

Wilson is not married.  (R. 104.)  Wilson lives with a female friend who is a stroke victim.  (R. 41, 139-40.)  Wilson took public transportation to his hearing by himself, but stated "I got a seat.  I was lucky." (R. 44.)  Wilson's daily routine involved getting up, washing himself, and walking and caring for his two dogs.  (R. 140-41.)  Wilson picks up after himself if he makes a mess. (R. 47.)  Wilson also puts out the garbage two times a week and goes to church on Sunday.  (R. 141.)  Because the grocery store is not far from his home, Wilson sometimes goes himself and

sometimes has others shop for him.  (R. 46.)  Wilson states that he does not do "too much" cooking.  (Id.)  Wilson enjoys reading and watching the television news.  (R. 47.)

Although Wilson used to exercise, he gained weight while working and now has a bad back.  (R. 140.)  Wilson stated that he is "too big" and has "trouble fitting into clothing."  (Id.)  Wilson reports having trouble bending to bathe, although he washes regularly.  (Id.)  Wilson stated that "I don't do too much" because of how his pain affects his activities.  (R. 141.)  Wilson goes to the doctor when in pain.  (Id.)

Wilson testified that he stopped working because, "Well, I had the time but I had medical problems.  I had trouble standing up, getting up, my back, my legs, you know."  (R. 42.)  Wilson reported that he stopped working "[b]ecause of [his] condition(s)" and "[b]ecause of other reasons."  (R. 119.)  Wilson wrote: "My medical conditions were worsening and limiting my ability to work, and I was eligible to retire."  (Id.)  Wilson indicated that his conditions did not cause him to make changes in his work activity.  (Id.)  Wilson reported that he used machines, tools or equipment in his work as well as technical knowledge or skills.  (R. 121.)  Wilson described the physical requirements of being a staff analyst as walking for three hours, standing for two hours, sitting for two hours, stooping for one hour, and writing, typing or handling small objects for four hours in a work day.  (Id.)  No lifting of more than ten pounds was required.  (Id.)

Wilson reported that although his weight fluctuates, it was close to 300 pounds in June 2013.  (R. 42.)  At the hearing in June 2013, Wilson reported pain and discomfort in his breathing, lower back and legs.  (R. 42-43.)  Wilson also reported asthma and chronic obstructive pulmonary disease ("COPD") that "comes and goes."  (R. 43.)  Wilson reported taking medication for the pain that "[s]ometimes" helped.  (R. 43.)  Wilson stops to rest a little when doing tasks, and stated that heat from baths or showers "sometimes" helps.  (R. 43.)  Wilson usually does not stand

for more than five or ten minutes at a time.  (R. 43-44.)  When asked how long he can sit for, Wilson stated "[s]ometimes I get up a couple minutes."  (R. 44.)  Wilson testified that he could walk for about five to ten minutes at a time.  (Id.)  Wilson reported difficulty climbing stairs and taking the subway to and from work as a result, which was one reason for Wilson leaving his job.  (R. 47-48.)

Wilson uses a nebulizer machine at home.  (R. 43.)  Wilson's conditions affect his sleeping, but he does not use any devices to aid in sleeping.  (R. 43, 140.)  Weather that is too hot or too cold affects Wilson's shortness of breath and causes his lungs to constrict.  (R. 48, 142.)  After Wilson's telephone interview for a disability report on May 22, 2012, the interviewer noted that Wilson "had great difficulty breathing during call, often coughing, choking and needing to take a break or drink water.  He also seemed to have difficulty reaching for papers, and during call stated he was feeling ill."  (R. 136.)

On August 16, 2012, Wilson completed a disability report online and reported "severe and constant low back pain" as a change that had occurred in his daily activities since his May 2012 report.  (R. 153-56.)

**Medical Evidence**

### Prior To January 2012

On October 27, 2005, Dr. Muhammed Naeem saw Wilson for a neck-related complaint.  (R. 189.)  Dr. Naeem described Wilson as "a pleasant, 50 year old male in no apparent distress who looks his given age, is well-developed and nourished with good attention to hygiene

and body habitus [sic]."  (Id.)  Dr. Naeem observed "no rales,[1/] rhonchi,[2/] wheezing, or rubs" on auscultation.[3/]  (R. 189.)  There was no cyanosis,[4/] clubbing or edema.[5/]  (R. 189.)  Wilson's muscles were full, symmetric and of normal tone.  (Id.)  On November 19, 2005, Dr. Naeem diagnosed Wilson with an acute upper respiratory infection.  (R. 190.)  Auscultation showed clear lungs without rubs.  (Id.)

On April 17, 2006, Dr. Naeem saw Wilson for complaints of pain in his neck and left forearm, as well as "mild to moderate" non-radiating lower back pain.  (R. 192.)  Dr. Naeem noted that a motor vehicle accident caused trauma to Wilson's lower back.  (Id.)  Wilson's weight was 258 pounds.  (Id.)  Examination results were largely unremarkable.  (Id.)  Dr. Naeem ordered an MRI "of the spinal canal and contents, cervical without contrast," opined that Wilson's neck and back pains were due to the accident, and referred Wilson to neurosurgery and pain management.  (Id.)  On June 15, 2006, Wilson showed no symptoms during examination.  (R. 194.)

Dr. Naeem saw Wilson on December 11, 2007 for unrelated conditions; his review of Wilson's respiratory and musculoskeletal systems was normal.  (R. 196.)

---

[1/]    A "rale" is a discontinuous sound heard primarily during inhalation.  Dorland's Illustrated Medical Dictionary at 1576 (32d ed. 2012).

[2/]    "Rhonchi" are continuous dry, low-pitched, snore-like noses from the throat or bronchial tube due to partial obstructions, such as from secretions.  Dorland's Illustrated Medical Dictionary at 1642.

[3/]    "Auscultation" is the act of listening for sounds within the body, chiefly for ascertaining the condition of the lungs.  Dorland's Illustrated Medical Dictionary at 180.

[4/]    "Cyanosis" is a bluish discoloration, especially of the skin and mucous membranes due to the excessive concentration of blood that does not contain oxygen.  Dorland's Illustrated Medical Dictionary at 452.

[5/]    "Edema" refers to the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body.  Dorland's Illustrated Medical Dictionary at 593.

On January 11, 2010, Wilson went to Dr. Naeem "for evaluation of breathlessness, dyspnea,[6] shortness of breath, tachypnea[7] and wheezing" brought on by walking that had been ongoing for two weeks.  (R. 198.)  Dr. Naeem's physical examination recorded Wilson's height as six feet, one inch, with a weight of 225 pounds and body mass index ("BMI") of thirty.  (Id.)  Dr. Naeem noted that Wilson was "distressed."  (Id.)  Lung auscultation revealed "expiratory wheezes bilateral."  (Id.)  Wilson took a spirometry[8] test with a predicted $FEV1$[9] value of 4.169 liters.  (R. 186.)  His pre-bronchodilator[10] FEV1 was 3.245 liters, seventy-eight percent of the predicted value. (R. 186.)  His post-brochodilator FEV1 was 3.112 liters, seventy-five percent of the predicted value. (Id.)  The spirometry report noted "[m]ild airway obstruction.  Post bronchodilator test not improved."  (R. 186, 198.)  Dr. Naeem recorded Wilson's test results and opined that Wilson had dyspnea, asthma and bronchitis.  (R. 198-99.)

At a February 9, 2010 follow-up evaluation with Dr. Naeem, Wilson reported that he still had shortness of breath and had not been taking his medication.  (R. 200.)  Wilson's physical

---

[6]    "Dyspnea" is breathlessness or shortness of breath, or labored or difficult respiration. Dorland's Illustrated Medical Dictionary at 582.

[7]    "Tachypnea" is excessive rapidity of breathing, or hyperventilation.  Dorland's Illustrated Medical Dictionary at 1868.

[8]    "Spirometry" is the measurement of the breathing capacity of the lungs, such as in pulmonary function tests using a spirometer or spirograph.  Dorland's Illustrated Medical Dictionary at 1751.

[9]    "FEV" is forced expiratory volume.  Dorland's Illustrated Medical Dictionary at 691. "FEV1" is the forced expiratory volume over one second, intended to gauge the maximum amount of air a person can exhale in one second.  See 20 C.F.R. § 718.103; Frank Bloch, Bloch on Social Security § 3:15 (2015).

[10]    A "bronchodilator" is an agent causing expansion of the cavities of the air passages of the lungs.  Dorland's Illustrated Medical Dictionary at 253, 1077.

exam results were "unchanged from previous visit," but Wilson was "in no apparent distress." (Id.)

Dr. Naeem diagnosed Wilson with dyspnea and ordered a diagnostic EKG. (Id.)

On November 29, 2010, Dr. Naeem saw Wilson again for "breathlessness, dyspnea, shortness of breath, tachypnea and wheezing" that had occurred for two weeks. (R. 201.) Dr. Naeem's review of Wilson's systems was substantially identical to his January 2010 review. (Id.) Dr. Naeem's physical examination recorded Wilson's height as five feet, with a weight of 150 pounds and BMI of twenty-nine. (Id.)[11] Dr. Naeem noted that Wilson was "distressed." (Id.) Lung auscultation revealed "expiratory wheezes bilateral." (Id.) Wilson undertook a spirometry test. (R. 185.) Pre-bronchodilator FEV1 was unreported. (Id.) The predicted FEV1 value was 2.777 liters. (Id.) Post-brochodilator FEV1 was 2.499 liters, ninety percent of the predicted value. (Id.) The spirometry report noted "Very severe obstruction, with low vital capacity. Post bronchodilator test markedly improved." (R. 202.) Dr. Naeem diagnosed Wilson with dyspnea, asthma and bronchitis. (Id.)

On December 20, 2010, pulmonologist Dr. Jay Dobkin examined Wilson. (R. 237-41.) Wilson reported having a cough and wheezing at night for the previous month. (R. 237.) Wilson reported chest congestion and green sputum, dyspnea on exertion[12] after two blocks, which had gotten worse over the previous month, and chronic pedal edema. (R. 237.) Wilson reported that he did not exercise, had a dog, worked in an office, and was in the area of the World Trade Center on September 11, 2001. (Id.) Dr. Dobkin recorded Wilson's height as seventy-three inches. (R.

---

[11]    No explanation is given as to the difference in Wilson's reported height and weight. (Compare R. 201 with R. 198.)

[12]    "Dyspnea on exertion" or "exertional dyspnea" is breathlessness or shortness of breath provoked by physical effort or exertion. Dorland's Illustrated Medical Dictionary at 582.

239.)[13/] Wilson weighed 268 pounds with a BMI of 35.49.  (Id.)  His peak flow was 350 out of a predicted value of 618.  (Id.)  Dr. Dobkin noted "Heavy Coughing and Shortness of Breath (Pulmonary Follow up.)."  (Id.)  Wilson was in no respiratory distress, was not coughing, and had unremarkable examination results.  (R. 239-40.) Dr. Dobkin wrote that "[s]pirometry was obtained 12/20/10.  Poor effort on the pre and post study.  Normal flow rates." (R. 240.) Dr. Dobkin ordered an x-ray and bronchospasm evaluation.  (Id.)  A December 21, 2010 x-ray of Wilson indicated COPD and air trapping.  (R. 244-45.)

Dr. Dobkin examined Wilson again on January 28, February 17, March 3, June 2 and September 15, 2011. (R. 180-82, 227-36.) In each instance, Wilson reported symptoms of wheezing and dyspnea after walking only short distances.  (Id.)  In January, Wilson had wheezing on examination and in February, Dr. Dobkin noted that Wilson had dyspnea after any exertion, a productive cough and frequent wheezing. (R. 180-82, 235-36.)  In March, June and September, Wilson's lungs were clear on auscultation bilaterally without wheezes or rales, and Wilson had no respiratory distress, cyanosis, clubbing, edema or deformity. (See R. 227-32.)  Dr. Dobkin repeatedly opined that Wilson should continue or restart his asthma medications. (See R. 180-82, 227-36.)

At the January 2011 examination, Wilson weighed 260 pounds with a BMI of 34.43. (R. 235.)  His peak flow was 260 out of a predicted value of 616.  (Id.)  Dr. Dobkin ordered full pulmonary function studies and rib x-rays.  (Id.)  On February 17, 2011, Wilson's effort on another spirometry exam was "fair."  (R. 180-81.)  The predicted FEV1 value was 4.26 liters.  (R. 181.) Baseline FEV1 was 3.14 liters, seventy-three percent of the predicted value.  (Id.)  No post-

---

[13/]     Several of Dr. Dobkin's subsequent examinations note that Wilson's recorded height reflects this December 2011 measurement.  (See R. 218, 221, 224, 227, 230, 233, 235.)

brochodilator study was obtained.  (Id.)  Wilson weighed 270 pounds and was seventy-four inches tall.  (Id.)  Dr. Dobkin requested a chest x-ray, which showed no evidence of rib fracture, pneumothorax or pneumonia.  (R. 183, 242-43.)

On March 3, 2011, Wilson weighed 280 pounds with a BMI of 37.08.  (R. 233.)  His peak flow was 360 out of a predicted value of 616.  (Id.)  On June 2, 2011, Wilson weighed 283 pounds with a BMI of 37.47.  (R. 230.)  His peak flow was 450 out of a predicted value of 616.  (Id.)  On September 15, 2011, Wilson weighed 288 pounds with a BMI of 38.13.  (R. 227.)  His peak flow was 300 out of a predicted value of 616.  (Id.)

### Medical Evidence From January 2012 Through June 2013

On February 13, 2012, Dr. Dobkin examined Wilson again for wheezing and dyspnea.  (R. 224-26.)  Wilson weighed 276 pounds with a BMI of 36.55.  (R. 224.)  He did not appear to be in pain and was in no respiratory distress, and his lungs were clear bilaterally without wheezing or rales.  (R. 224-25.)  His peak flow was 350 out of a predicted value of 613.  (R. 224.)  Wilson's examination results and diagnosis were substantially identical to those from June and September 2011.  (Id.)

On April 17, 2012, Wilson complained to Dr. Naeem of cold symptoms that had been present for two to three days.  (R. 205.)  Dr. Naeem noted a sore throat, nasal congestion and cough with yellow phlegm.  (Id.)  Wilson reported wheezing and "exertional shortness of breath."  (Id.)  Wilson appeared "[n]ot sick but congested."  (R. 206.)  Wilson's nose was stuffy and his throat congested.  (Id.)  Dr. Naeem opined that Wilson suffered from acute bronchitis and acute asthma, and prescribed antibiotics.  (Id.)

An April 17, 2012 spirometry report for Wilson for show that his predicted FEV1 value was 2.729 liters.  (R. 184.)  Pre-bronchodilator FEV1 was 3.076 liters, 113 percent of the

predicted value.  (Id.)  Post-brochodilator FEV1 was 3.532 liters, 129 percent of the predicted value.  (Id.)  The spirometry was "[n]ormal" and the "[p]ost bronchodilator test improved."  (Id.)

On April 26, 2012, Dr. Naeem saw Wilson for a follow up on his shortness of breath.  (R. 203.)  Dr. Naeem noted that Wilson was "better" and appeared comfortable.  (Id.)  Wilson's lungs were "[b]ilateral clear on ausculta[t]ions and no additional sounds present."  (R. 204.)

On May 3, 2012, Dr. Dobkin examined Wilson, who reported symptoms consistent with his prior treatment by Dr. Dobkin.  (R. 221-23.)  Wilson weighed 271 pounds with a BMI of 35.88.  (R. 221.)  Wilson's peak flow was 350 out of a predicted value for peak flow of 613.  (Id.)  Once again, Wilson's examination results were consistent with his prior treatment from Dr. Dobkin, whose diagnosis and opinion remained unchanged.  (R. 221-22.)

On June 27, 2012, consultative internist Dr. Sharon Revan examined Wilson.  (R. 209-13.)  Wilson's chief complaints were low back pain, bilateral knee pain, "overweight," sinus problems, asthma, and pain in the back of his head.  (R. 209.)  Dr. Revan recorded Wilson's height as five feet, eleven inches.  (R. 210.)  Wilson described his activities as showering and dressing himself; taking his time with cooking, cleaning, laundry and shopping; listening to the radio; and following up with his doctor.  (Id.)  On examination, Wilson was in no acute distress and had both a normal gait and stance.  (Id.)  Wilson performed a squat "halfway, holding on due to back pain."  (Id.)  Wilson was unable to walk on heels and toes.  (Id.)  He did not require an assistive device, needed no help changing for the examination or getting on or off the examination table, and could rise from a chair without difficulty.  (R. 210-11.)  Wilson's chest and lungs were normal in diameter, clear to auscultation, had normal percussion and diaphragmatic motion, and there was no significant

chest wall abnormality.  (R. 211.)  Wilson had no scoliosis,[14/] kyphosis[15/] or abnormality in his thoracic spine.  (Id.)  His straight leg raising test was positive to sixty degrees bilaterally, negative on sitting.  (Id.)  X-rays of his lumbosacral spine were normal.  (R. 212, 214.)  Wilson was obese.  (R. 211.)  Wilson had a full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally, with no evidence of subluxations,[16/] contractures, ankylosis[17/] or thickening.  (R. 211.)  He had pain in his knees with movement.  (Id.)  His joints were stable and non-tender, with no redness, heat, swelling or effusion.  (Id.)  Wilson had no cyanosis, clubbing, edema, significant trophic changes or evidence of muscle atrophy.  (R. 212.)  Wilson's hand and finger dexterity were intact, with full strength bilaterally.  (Id.)

Dr. Revan diagnosed Wilson with lower back pain, bilateral knee pain, overweight, sinus problems, asthma and head pain.  (Id.)  Dr. Revan gave Wilson a "[f]air" prognosis.  (Id.)  Dr. Revan opined that Wilson had no limitations with speech, vision, hearing, or use of the upper extremities for fine and gross motor activity.  (Id.)  Dr. Revan opined that Wilson had mild limitations with walking due to knee pain, mild limitations with climbing stairs due to shortness of breath, and mild limitations on the activities of daily living.  (Id.)  Dr. Revan opined that Wilson had "[l]imitations with standing and sitting due to back pain and neck pain."  (Id.)

---

[14/]     "Scoliosis" is an appreciable lateral deviation in the normally straight vertical line of the spine.  Dorland's Illustrated Medical Dictionary at 1681.

[15/]     "Kyphosis" is convexity in the curvature of the spine.  Dorland's Illustrated Medical Dictionary at 992.

[16/]     A "subluxation" is an incomplete or partial dislocation.  Dorland's Illustrated Medical Dictionary at 1791.

[17/]     "Ankylosis" is the immobility and consolidation of a joint whether due to disease, injury or surgery.  Dorland's Illustrated Medical Dictionary at 94.

On August 9, 2012, Wilson had a follow-up examination with Dr. Dobkin relating to his asthma and dyspnea, which remained largely unchanged from prior visits, although he now reported two episodes of wheezing a week.  (R. 218.)  Wilson's weight was 284 pounds, and his BMI was 37.60.  (Id.)   His peak flow was 350 out of predicted value of 613.  (R. 218.)  Examination results were otherwise unremarkable, and Dr. Dobkin's opinion remained consistent with prior examinations.  (R. 218-19.)

On September 28, 2012, state agency medical consultant Dr. Jack Bankhead reviewed Wilson's medical records and concluded that the data presented would fully support a residual functional capacity ("RFC") for light work.  (R. 246.)  Dr. Bankhead noted the pulmonary function test from February 17, 2011 showing a pre-bronchodilator FEV1 of 3.14 liters, which he characterized as "73% of normal."  (Id.)  Dr. Bankhead also noted the April 2012 pulmonary function test showing a post-bronchodilator FEV1 of 3.52 liters, which he characterized as "129% of normal." (Id.)  From the June 2012 consultative examination, Dr. Bankhead noted that Wilson's straight leg raise was "positive at 60 degrees, [that Wilson had] mild limitations in forward flexion, normal neurological exam, [and] normal fine motor activity."  (Id.)  Dr. Bankhead noted that Wilson's lumbar x-rays were negative.  (Id.)

On February 5, 2013, Dr. Dobkin examined Wilson once more.  (R. 250-52.)  Wilson's reported symptoms remained essentially unchanged.  (R. 250.)  Wilson was seventy-three inches tall and weighed 293 pounds with a BMI of 38.80.  (Id.)  Wilson's peak flow was 360 out of a predicted value for peak flow of 607.  (R. 250-51.)  Once again, Wilson's examination results were otherwise unremarkable and Dr. Dobkin's opinion unchanged.  (Id.)

On May 14, 2013, treating physician Dr. Husain prepared a physical capacity evaluation for Wilson.  (R. 248.)  Dr. Husain opined that Wilson could lift a maximum of five

pounds, stand and/or walk for up to two hours per day and sit for less than six hours in an eight-hour workday.  (Id.)  Dr. Husain provided no documentation or explanation for the basis of his opinion. (Id.)

On May 30, 2013, Dr. Naeem completed a pulmonary medical source statement.  (R. 254-57.)  Dr. Naeem stated that he had been seeing Wilson for ten years and had diagnosed Wilson with COPD and obesity.  (R. 254.)  Dr. Naeem identified Wilson's symptoms as shortness of breath, orthopnea, chest tightness and fatigue.  (Id.)  Dr. Naeem speculated without further explanation that emotional factors relating to Wilson's wife's stroke contributed to the severity of Wilson's symptoms and functional limitations.  (Id.)  Dr. Naeem gave Wilson a poor prognosis and indicated that Wilson's limitations had lasted or would last at least twelve months.  (R. 255.)  Dr. Naeem opined that Wilson could only walk half a block without rest or severe pain.  (Id.)  Dr. Naeem opined that Wilson could sit for fifteen minutes at a time before needing to get up, and stand for ten minutes before needing to sit down or walk around.  (Id.)  Dr. Naeem opined that Wilson could sit for a total of less than two hours in an eight-hour work day with normal breaks.  (Id.)  Dr. Naeem opined that Wilson would have to take unscheduled breaks of a few minutes duration every few hours to sit quietly.  (Id.)  Dr. Naeem opined that Wilson would be "'off task'" for twenty-five percent or more of each workday.  (R. 256.)  Dr. Naeem opined that Wilson's conditions would likely cause good and bad days at work and absences of approximately three days per month.  (R. 257.)  Dr. Naeem opined that Wilson could never lift any weight, nor could he twist, stoop, squat, climb ladders or climb stairs.  (R. 256.)  Dr. Naeem opined that Wilson should avoid concentrated exposure to extreme heat or cold and avoid all exposure to cigarette smoke, solvents/cleaners, fumes, odors, gases, dust and chemicals.  (Id.)  Dr. Naeem opined that because of Wilson's COPD and obesity he was incapable of even low stress jobs.  (R. 257.)

**ALJ Friedman's Decision**

On June 27, 2013, ALJ Friedman denied Wilson's claim for benefits.  (R. 16-25.)

ALJ Friedman followed a five-step analysis, considering Wilson's testimony and the medical record.

(R. 19-21.)  At the first step, ALJ Friedman determined that Wilson "has not engaged in substantial

gainful activity since January 29, 2012, the alleged onset date."  (R. 21.)

At the second step, ALJ Friedman determined that Wilson had "the following severe

impairments: Obesity, Chronic Obstructive Pulmonary Disorder, and Orthopedic Pain."  (Id.)

At the third step, ALJ Friedman determined that Wilson "does not have an

impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 21.)  ALJ Friedman

"considered section[] 3.02 of the Listings in particular" in making his finding, stating:

> An individual of the claimant's height must have an FEV1 of 1.65 or less to meet
> Listing 3.02.  Here, the claimant's medical evidence indicates an FEV1 no less than
> 2.499.  Therefore, the claimant's chronic obstructive pulmonary disorder does not
> satisfy the requirements of Listing 3.02.
>
> Furthermore, orthopedic pain and obesity are not listed impairments.  The
> undersigned has considered these impairments to the extent that they affect other
> bodily systems.  Here, his pain and obesity do not either singly, or in combination,
> meet or medically equal any listed impairment.

(R. 21, record citation omitted.)

ALJ Friedman found that Wilson had the RFC "to perform light work as defined in

20 CFR 404.1567(b) except he is restricted from performing jobs involving pulmonary irritants."

(R. 22.)  ALJ Friedman "considered all symptoms and the extent to which these symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Id.)

He also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and

SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (R. 22.)  ALJ Friedman found that Wilson's medically

determinable impairments could reasonably be expected to cause Wilson's alleged shortness of breath that "'comes and goes'" and chronic pain limiting his ability to work.  (R. 22.)  However, ALJ Friedman found that Wilson's statements concerning the intensity, persistence and limiting effects of the symptoms were "not entirely credible."  (R. 22.)  In particular, ALJ Friedman wrote:

> [Wilson's] activities suggest that he is not as limited as he has alleged.  He engages in a daily routine that includes the walking and caring for dogs.  He is able to care for himself and his home.  Additionally, his records indicate that he ceased work in March of 2012 through retirement, not as a result of limitations due to his condition.  These facts strongly suggest that the claimant's allegations are not fully credible.

(R. 23, record citations omitted.)  Despite finding Wilson not entirely credible, ALJ Friedman found that Wilson's orthopedic pain, obesity and COPD limited him to light work without exposure to pulmonary irritants.  (Id.)

ALJ Friedman acknowledged that Wilson's reported lower back, neck and leg pain when standing and walking was supported in the medical records, and that Wilson exhibited positive straight leg raising while supine.  (R. 22.)  However, ALJ Friedman found this outweighed by Wilson's appearance and performance in examinations, responsiveness to pain treatments, and normal medical imaging.  (Id.)  ALJ Friedman highlighted that Wilson "is able to care for himself, including dressing, bathing, cooking meals, and shopping.  He is able to travel via train to attend appointments."  (R. 22-23, record citation omitted.)

ALJ Friedman stated that Wilson's height of seventy-three inches and weight fluctuating around 300 pounds placed him "well within the range of obese."  (R. 23.)  ALJ Friedman stated that Wilson's "records do not indicate any significant complications from his obesity beyond possible contribution to his orthopedic pain."  (Id.)  ALJ Friedman noted that Wilson "does not exercise and only 'tries to watch his diet.'"  (Id.)

ALJ Friedman found that Wilson's medical records indicated that his chronic

obstructive pulmonary disorder had been less persistent and limiting than alleged.  (Id.)  Although ALJ Friedman noted that Wilson had experienced "'very severe obstruction, with low vital capacity,'" and had occasional shortness of breath and wheezing, ALJ Friedman noted six examinations where Wilson's lungs were clear to auscultation without wheezing, rhonchi or rales.  (Id.)  ALJ Friedman also noted that Wilson's records stated that he was "'doing well'" and was "'stable.'"  (Id.)  Additionally, ALJ Friedman observed that Wilson's own physician found that he only had "'mild obstructive disease.'"  (Id.)

ALJ Friedman also relied on Wilson's objective medical tests: "Furthermore, objective medical tests have shown FEV1 peak flow testing of 3.14, 3.076, 3.532, 2.499, and 3.245. This testing has ranged from 73% to 129% of predicted and normal rates. . . . This suggests that his condition is not as limiting as alleged."  (Id., record citations omitted.)  ALJ Friedman noted Wilson's walking and caring for dogs, for himself and for his home.  (Id.)  ALJ Friedman also observed that Wilson's "records indicate that he ceased work in March of 2012 through retirement, not as a result of limitations due to his condition."  (Id.)  ALJ Friedman concluded that "[t]hese facts strongly suggest[ed]" that Wilson's allegations were "not fully credible."  (Id.)

ALJ Friedman accorded "great weight" to the opinion of state agency reviewer Dr. Bankhead that Wilson is capable of performing light exertional work.  (R. 23.)  ALJ Friedman noted that Dr. Bankhead "based his opinion on findings from [objective] peak flow testing revealing FEV1 levels in 2012 up to 129% of expected values" and on the fact that Wilson had a positive straight leg raising test and some limitation in forward flexion.  (Id.)  ALJ Friedman gave Dr. Bankhead's opinion great weight because "his opinion's rationale is explained in great detail" and "is consistent with [Wilson's] objective medical evidence" despite the fact that Dr. Bankhead is neither a treating nor examining source.  (Id.)

ALJ Friedman gave "some weight" to consultative examiner Dr. Revan's opinion. (R. 24.) ALJ Friedman noted Dr. Revan's opinion that Wilson had "only 'mild limitations with walking due to knee pain.  Limitations with standing and sitting due to back pain and neck pain [and] mild limitation to climbing stairs due to shortness of breath.'"  (Id.) ALJ Friedman noted that Dr. Revan's opinion did not provide specific limitations on Wilson's abilities nor specify her opinion as to an appropriate exertional category.  (Id.) ALJ Friedman found that Dr. Revan's opinion was "somewhat consistent with the objective medical evidence, including FEV1 testing," and was based on an examination of Wilson.  (Id.)  Dr. Revan's opinion was given only some weight because it "fail[ed] to give specific limitations or abilities."  (Id.)

ALJ Friedman gave "little weight" to treating physician Dr. Naeem's opinion that Wilson could stand for only ten minutes, sit for fifteen minutes at a time for a total of two hours, lift no more than ten pounds, had limitations in motion, must avoid exposure to many environmental factors, had an inability to work at even low stress jobs, and would be off-task twenty-five percent of the day.  (R. 24.)  ALJ Friedman found that Dr. Naeem's opinion was "inconsistent with the medical evidence as a whole."  (Id.)  ALJ Friedman compared Dr. Naeem's reliance on Wilson's "fatigue, shortness of breath, orthopnea, and chest tightness" with records that "routinely show [Wilson] to have lungs clear to auscultation," and concluded that Wilson's "medical records do not support Dr. Naeem's opinion."  (Id.)  ALJ Friedman also noted Wilson's reportedly stable condition, "normal FEV1 peak flow testing," and actual "activities of daily living that demonstrate abilities beyond those opined by Dr. Naeem."  (Id.)

ALJ Friedman also gave "little weight" to treating physician Dr. Husain's opinion. (R. 24.)  ALJ Friedman noted Dr. Husain's opinion that Wilson could stand or walk for up to two hours per day, stand for less than six hours per day, and lift only five pounds.  (Id.)  ALJ Friedman

observed that Dr. Husain's opinion "contain[ed] no explanation or reference of objective medical evidence or tests" and was "merely conclusory in nature." (Id.) Further, ALJ Friedman noted that "objective medical evidence, including spirometric testing, reveals that [Wilson's] conditions, including COPD, are not nearly as limiting as he has alleged." (Id.) Therefore, ALJ Friedman found Dr. Husain's opinion to be inconsistent with the medical evidence and not entitled to controlling weight as the opinion of a treating physician. (Id.)

ALJ Friedman did not address Dr. Dobkin's medical records. (R. 19-25.)

At the fourth step, ALJ Friedman determined that Wilson "is capable of performing past relevant work as a Staff Analyst" as the work "does not require the performance of work-related activities precluded by [Wilson's] residual functional capacity." (R. 24.) In comparing Wilson's RFC to his past relevant work, ALJ Freidman found that because Wilson "is able to perform light exertional work and is only precluded from work involving pulmonary irritants . . . [Wilson is] capable of returning to his past relevant work as a Staff Analyst." (R. 25.) ALJ Friedman noted that work as a staff analyst required lifting no more than ten pounds, walking for three hours, standing for two hours, and sitting for two hours during a workday. (Id.) ALJ Friedman also noted that Wilson "did not testify that his work involved work with pulmonary irritants." (Id.)

ALJ Friedman concluded that Wilson had not been under a disability from January 29, 2012 through the date of his decision, June 27, 2013, and did not continue to step five. (R. 25.)

**Additional Evidence Before the Appeals Council**

On July 29, 2013, Wilson submitted medical evidence from Dr. Carl Gerardi (spanning the period from April 22, 2008 to May 1, 2013) to the Appeals Council with his request to review ALJ Friedman's decision. (R. 4, 258-364.)

Dr. Gerardi saw Wilson on numerous occasions for urology-related treatments. (See,

e.g., R. 260, 352, 353.)  On May 14, 2008, Dr. Gerardi performed a TUNA procedure on Wilson. (R. 352, 362.)  On September 8, 2009, Wilson again saw Dr. Gerardi.  (R. 288.)  Wilson did not report fatigue, nasal congestion, cough, shortness of breath, wheezing, back pain, joint pain, muscle pain or dizziness.  (Id.)

On April 6, 2010, Wilson was examined by Dr. Gerardi.  (R. 284, 332.)  Wilson did not report fatigue, nasal congestion, cough, shortness of breath, wheezing, back pain, joint pain, muscle pain or dizziness.  (R. 284, 333.)  Wilson reported his height as seventy-three inches and his weight as 250 pounds, which calculates a BMI of 32.98.  (R. 284.)  Wilson's respiration was noted as "[u]nlabored."  (Id.)  On physical examination, Dr. Gerardi noted that Wilson was "[n]ot in acute distress" and had "normal respiratory effort" on chest and lung exam.  (R. 284-85.)  Notes from Wilson's May 18, June 15, and September 21, 2010 examinations by Dr. Gerardi are essentially identical.  (R. 277, 279-80.)

On February 20, 2013, Wilson reported to Dr. Gerardi that he had fatigue, nasal congestion, shortness of breath, cough, wheezing, chest pain and palpitations, back pain, joint pain, muscle pain and dizziness.  (R. 271, 311.)  Wilson's height was recorded as seventy-three inches with a weight of 250 pounds and BMI of 32.98.  (R. 270.)  On Wilson's patient history form, he reported present medical problems with his back, legs, asthma, obesity and veins.  (R. 310.)  On physical examination, Dr. Gerardi noted that Wilson was "[n]ot in acute distress" and had "normal respiratory effort" on chest and lung exam.  (R. 271-72.)  On March 12, 2013, Wilson reported identical symptoms and had identical examination results.  (R. 267-68.)  On April 4, 2013, Dr. Gerardi completed a physical capacity evaluation for Wilson, opining that Wilson had no limitations on lifting and carrying, no limitations on standing or walking, and no limitations on sitting.  (R. 297.)  On April 10 and on May 1, 2013, Wilson again reported symptoms identical to February 2013

and had identical examination results.  (R. 261-62, 264-65.)

**The Appeals Council's Decision**

On July 8, 2013, Wilson requested Appeals Council review of ALJ Friedman's decision.  (R. 14.)  Wilson's counsel argued that the ALJ had "1.  Made no function by function assessment of the [Wilson's] residual functional capacity.  2.  Failed to properly assess [Wilson's] complaints.  3. Failed to recognize the need for vocational expert testimony due to his finding that [Wilson's] 'chronic obstructive pulmonary disorder mandates that he not work with pulmonary irritants.'"  (R. 169.)  On October 10, 2014, the Appeals Council considered the additional evidence submitted by Wilson, concluded that it did not provide a basis for changing ALJ Friedman's decision, and denied review. (R. 1-5.)  ALJ Friedman's decision thus became the Commissioner's final decision.

<h2 align="center">ANALYSIS</h2>

**I.**     **THE APPLICABLE LAW**

**A.**     **Definition Of Disability**

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[18]

---

[18]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010);
(continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[19]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[20]

---

[18]    (...continued)
Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[19]    See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[20]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

**B.**    **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[21/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[22/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[23/]  "[F]actual issues need not have been resolved by the [Commissioner]

---

[21/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[22/]    See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[23/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174
(continued...)

in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[24/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of

---

[23/]     (...continued)
F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[24/]     See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[25/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[26/]

## C.    The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

If we find that a treating source's opinion on the issue(s) of the nature and severity

---

[25/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[26/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

> of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given to a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to

Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

**D.      The ALJ's Duty To Develop The Record**

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record:

> [I]t is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009) (internal quotation marks and brackets omitted) [, cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), [amended on other grounds], 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant). Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted).  "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009). This duty is heightened when a claimant proceeds pro se, see, e.g., Moran v. Astrue, 569 F.3d at 113; Hamilton v. Colvin, 10 Civ. 9641, 2013

WL 3814291 at *13 (S.D.N.Y. July 23, 2013), but still "applies even where the applicant is represented by counsel," see, e.g., Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (ALJ must seek additional record evidence when there are "obvious gaps," even when represented parties are involved); Rivera v. Comm' of Soc. Sec., 728 F. Supp. 2d 297, 321-22, 328-29 (S.D.N.Y. 2010).

The ALJ has an affirmative duty to fill any obvious gaps in the administrative record prior to rejecting a treating physician's opinion.  See, e.g., Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (citing Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999)); Barbera v. Barnhart, 151 F. App'x 31, 33 (2d Cir. 2005); Ulloa v. Colvin, 13 Civ. 4518, 2015 WL 110079 at *11 (S.D.N.Y. Jan. 7, 2015).[27/]  "However, 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'"  Swiantek v. Comm'r of Soc. Sec., 588 F. App'x at 84 (quoting Rosa v. Callahan, 168 F.3d at 79 n.5); see also, e.g., Abbott v. Colvin, 596 F. App'x 21, 24 (2d Cir. 2015); Eusepi v. Colvin, 595 F. App'x at 9 (for claimant represented by counsel the ALJ must seek additional record evidence only where there are "obvious gaps"); Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) (finding it unnecessary to obtain a treating source opinion where "a voluminous medical record" exists "that [is] adequate to permit an informed finding by an ALJ").

## II.   BECAUSE ALJ FRIEDMAN DID NOT SUFFICIENTLY DEVELOP THE RECORD, REMAND IS NECESSARY

ALJ Friedman found that Wilson had the RFC to "perform light work as defined in

---

[27/]   In March 2012 the Commissioner amended 20 C.F.R. §§ 404.1512 and 416.912 to remove paragraphs requiring an ALJ to re-contact a treating physician under certain circumstances. See 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) (effective 6/13/11 to 3/25/12); see also Ulloa v. Colvin, 2015 WL 110079 at *11 n.6.

20 CFR 404.1567(b) except he is restricted from performing jobs involving pulmonary irritants."
(See page 14 above.)   Wilson argues that ALJ Friedman's RFC determination for Wilson is
contradicted by the medical evidence of record, particularly that Wilson's pulmonary function test
results, "do not support a finding that Mr. Wilson enjoyed an unrestricted capacity for walking."
(Dkt. No. 15: Wilson Br. at 15-16.) Wilson argues that where "ALJ Friedman reviewed the file and
cites the FEV1 findings as reflective of normal findings, he impermissibl[y] sets his lay
interpretation of the evidence against that of Dr. Naeem, a board certified internist [who] has treated
Mr. Wilson for more than ten years."  (Dkt. No. 15: Wilson Br. at 16, record citation omitted.)

> In assessing whether a claimant has a disability, the factors to be considered include:
>
> "(1) the objective medical facts; (2) diagnoses or medical opinions based on such
> facts; (3) subjective evidence of pain or disability testified to by the claimant or
> other[s]; and (4) the claimant's educational background, age, and work experience."

Singleton v. Colvin, 13 Civ. 4185, 2015 WL 1514612 at *12 (S.D.N.Y. Mar. 31, 2015) (quoting
Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980)); see also, e.g., Sayles v. Colvin, 13 Civ. 6129,
2014 WL 4384133 at *11 (S.D.N.Y. Aug. 28, 2014), report & rec. adopted, 2014 WL 4631202
(S.D.N.Y. Sept. 16, 2014); Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 319 (S.D.N.Y.
2010).

In determining Wilson's RFC, ALJ Friedman relied extensively on Wilson's objective
pulmonary function tests (specifically, spirometry tests), interpretations of those tests by Wilson's
doctors and state examiners, and the ALJ's own interpretation of them.  (See pages 16-18 above.)
ALJ Friedman referred to five specific FEV1 results and stated that Wilson's "testing has ranged
from 73% to 129% of predicted and normal rates."  (See page 16 above).  ALJ Friedman also relied
on Wilson's spirometry results and his doctors' interpretations of them in determining Wilson's
credibility when he found that Wilson's symptoms were not substantiated by objective medical

evidence.  (See page 16 above.)

   ALJ Friedman also relied on the spirometry results in determining the weight to be given to the medical opinion evidence in the record.  (See pages 16-18 above.)  ALJ Friedman gave "great weight" to state agency reviewing physician Dr. Bankhead's opinion because he "based his opinion on findings from [objective] peak flow testing revealing FEV1 levels in 2012 up to 129% of expected values."  (See page 16 above.)  ALJ Friedman gave "some weight" to consultative examiner Dr. Revan's opinion as "somewhat consistent with [Wilson's] objective medical evidence, including FEV1 testing."  (See page 17 above.)  ALJ Friedman gave "little weight" to treating physician Dr. Naeem's opinion because Wilson's "medical records do not support Dr. Naeem's opinion" including Wilson's "normal FEV1 peak flow testing."  (See page 17 above.)  ALJ Friedman also gave little weight to treating physician Dr. Husain's opinion in part because "objective medical evidence, including spirometric testing, reveals that [Wilson's] conditions, including COPD, are not nearly as limiting as he has alleged."  (See pages 17-18 above.)

   There is, however, an obvious gap in the medical record in the form of the pulmonary function tests' multiple and unexplained predicted normal values for Wilson.  Spirometry is an objective form of pulmonary function testing.  See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00 (A), (E).  Two particular measurements are important: "one-second forced expiratory volume (FEV1) and forced vital capacity (FVC)." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00(E).  A person's reported FEV1 and FVC are gauged in relation to the predicted normal value of each measure for an individual.  See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00(E) (triggering use of a bronchodilator "if the pre-bronchodilator FEV1 value is less than 70 percent of the predicted

normal value").[28]   The predicted normal value for each person is a <u>fixed</u> value based off of a person's height.  <u>See</u> 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00(E) ("The pulmonary function tables in 3.02 and 3.04 are based on measurement of standing height without shoes."); 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02(A), Table I (establishing Listed disability for "[c]hronic obstructive pulmonary disease . . . with the FEV1 equal to or less than the values specified in table I corresponding to the person's height without shoes").[29]

        As opposed to one fixed predicted normal value for Wilson's FEV1, as many as four different predicted normal values appear in the record.  (<u>See</u> pages 6-9 above.)[30]  It is unclear how these predicted values were determined.  Only one of Wilson's spirometry reports actually records Wilson's height and weight -- Dr. Dobkin's February 2011 test, which notes them as seventy-four inches and 270 pounds respectively.  (<u>See</u> R. 180-81; page 9 above.)  The predicted normal value for FEV1 in Dr. Dobkin's records was 4.26 liters.  (<u>See</u> page 8 above.)  Dr. Dobkin's predicted normal value is consistent with the NHANES III Reference Value for a fifty-six year old Caucasian male standing 188 centimeters (seventy-four inches) tall.  <u>See</u> NIOSH Division of Respiratory

---

[28]   <u>See also</u>, <u>e.g.</u>, <u>Sayles</u> v. <u>Colvin</u>, 2014 WL 4384133 at *7 (utilizing reported values as a percentage of predicted normal values); <u>Padilla</u> v. <u>Colvin</u>, 10 Civ. 4762, 2013 WL 4125039 at *8, *13 (S.D.N.Y. Aug. 15, 2013).

[29]   Although height is the principle measurement needed to calculate FEV1 for the purposes of disability determinations, <u>see</u> 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02, the most accurate predicted normal values require information about a person's age, gender, height and race or ethnicity.  <u>See</u> National Institute for Occupational Safety & Health ("NIOSH") Spirometry Training Guide § 6-1 (2003) ("to optimally interpret spirometry results (observed values), you must first know the [person's] age, height, gender, and race or ethnicity."). NIOSH Division of Respiratory Disease Studies, NHANES III Reference Values, <u>available at</u> http://www.cdc.gov/niosh/topics/spirometry/nhanes.html (tables based on gender, race or ethnicity, age, and ultimately height).

[30]   The Commissioner concedes that the "predicted FEV1 values contained in each report were not identical."  (Dkt. No. 19: Gov't Br. at 20.)

Disease Studies, NHANES III Reference Values (predicted normal FEV1 of 4.27 liters), available at http://www.cdc.gov/niosh/topics/ spirometry/nhanes.html.[31/]  Wilson's FEV1 was seventy-three percent of predicted normal value on Dr. Dobkin's February 17, 2011 exam.  (R. 181; see page 8 above.)

 The predicted FEV1 values listed for Wilson's other pulmonary function tests vary, and as a result his reported FEV1 percentage varies in both his pre- and post-bronchodilator results:

| Date | Predicted FEV1 | Actual FEV1 | Percentage of Predicted FEV1 | Percentage of Dr. Dobkin's Predicted FEV1 (4.26) |
|---|---|---|---|---|
| Jan. 11, 2010 | 4.169 | 3.245 | 78% | 76% |
|  | 4.169 | 3.112 | 75% | 73% |
| Nov. 29, 2010 | 2.777 | unreported | n/a | n/a |
|  | 2.777 | 2.499 | 90% | 59% |
| Apr. 17, 2012 | 2.729 | 3.076 | 113% | 72% |
|  | 2.729 | 3.532 | 129% | 83% |

(See pages 6-10 above.)[32/]  Wilson's FEV1 results vary widely as a percentage of his predicted results depending on whether they are calculated based on the predicted values reported in those spirometry results or based on Dr. Dobkin's predicted normal FEV1 value for Wilson, which is

---

[31/] Wilson's race and ethnicity are unclear from the record.  (Compare R. 179 ("Black"), with R. 181, 184, 185, 186 ("Caucasian").)

[32/] For each date listed in the table, the first line contains pre-bronchodilator results, while the second line contains post-bronchodilator results.  ALJ Friedman made no distinction between pre-bronchodilator and post-bronchodilator results in citing to the FEV1 results or their percentages in relation to the predicted normal value, citing a mix of both.  (See R. 23.)

consistent with the relevant NHANES III Reference Value.  (See pages 30-31 above.)

The record contains insufficient information to determine how the other predicted normal values were generated or why they vary, because no height or other information actually was recorded on any of the spirometry reports other than Dr. Dobkin's February 17, 2011 report.  (R. 180-81, 184-85; see pages 6-7, 9-10 above.)  Moreover, although the 2010 spirometry results from Dr. Naeem that omit Wilson's height and weight were obtained on the same days as examinations that do note Wilson's height and weight,  Dr. Naeem's records contain wildly different heights and weights for Wilson on each occasion.  (See R. 198, 201; pages 6-7, 7 n.11 above.)  Finally, neither Wilson's April 17, 2012 spirometry result nor Dr. Naeem's examination records from the same day mention Wilson's height or weight.  (See R. 184, 205; pages 9-10 above.)  Because Wilson's predicted normal FEV1 value varies greatly without explanation, it is unclear that the measurement of his reported FEV1 as a percentage of his predicted normal FEV1 has any utility whatsoever.[33] There is no evidence in the record indicating that any of the medical experts were aware of, or adjusted for, the erroneous divergence in predicted normal values.  (See R. 180-82, 184-86, 198-99, 201-02, 246.)

It is not the ALJ's role (nor the Court's, for that matter) to determine which predicted normal value from the variety of  available reference values is correct or how the spirometry results should be interpreted.  See, e.g., Calzada v. Astrue, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("An ALJ must not substitute his 'own assessment of the relative merits of the objective evidence and

---

[33]    Reported FEV1 as a percentage of predicted normal FEV1 can provide medical experts with a rough measure of the severity of a person's COPD.  See, e.g., Charles T. Hall, Soc. Sec. Disab. Prac. §§ 7:14 (quoting the Global Initiative for Chronic Obstructive Lung Disease ("GOLD") criteria for evaluating COPD using FEV1 relative to predicted normal value), 8:25 ("Stage II: Moderate COPD - Worsening airflow limitation (FEV1/FVC < 70%; 50% <= FEV1 < 80% predicted)") (practice form).

subjective complaints for that of a treating physician.'"); Melendez v. Astrue, 630 F. Supp. 2d 308, 313 (S.D.N.Y. 2009) (ALJ obtained testimony of medical expert to interpret pulmonary function tests).  Despite the insufficient evidence concerning the divergence in Wilson's predicted normal values for his FEV1 results, ALJ Friedman did not seek further information from any of Wilson's doctors or the consulting doctors.  (See R. 19-25.)  This left ALJ Friedman with an incomplete record on which to base his RFC determination, and the Court cannot determine whether it is supported by substantial evidence.  See, e.g., Corporan v. Comm'r of Soc. Sec., 12 Civ. 6704, 2015 WL 321832 at *21 (S.D.N.Y. Jan. 23, 2015) ("Indeed, the Court cannot . . . [decide] whether the ALJ's decision regarding [plaintiff's] functional capacity was supported by substantial evidence if the determination was based on an incomplete record."); Stuart v. Colvin, No. 13-CV-04552, 2014 WL 4954487 at *13 (E.D.N.Y. Sept. 30, 2014); Legall v. Colvin, 13 Civ. 1426, 2014 WL 4494753 at *4 (S.D.N.Y. Sept. 10, 2014) ("'[b]ecause an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his [or her] own opinion for that of a physician, and has committed legal error'" (citing Hilsdorf v. Commr' of Soc. Sec., 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010))); Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d at 318-19, 331-32 (legal error in failure to develop record makes substantial evidence inquiry unnecessary).  ALJ Friedman thus failed in his "affirmative obligation to fully develop the administrative record," Calzada v. Astrue, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010).

Legal errors regarding the duty to develop the record warrant remand.  See, e.g. Rosa v. Callahan, 168 F.3d 72, 79-80 (2d Cir. 1999) (Sotomayor, C.J.) (remanding where ALJ failed to fully develop record by neglecting to seek information or explanation to supplement treating physicians "sparse" notes which were "'conclusive of very little'"); Elliott v. Colvin, No. 13-CV-

2673, 2014 WL 4793452 at *18 (E.D.N.Y. Sept. 24, 2014) ("[W]here the ALJ has failed to fully

develop the factual record, the proper remedy is to remand the case for further proceedings.");

Barnwell v. Colvin, 13 Civ. 3683, 2014 WL 4678259 at *12 (S.D.N.Y. Sept. 9, 2014); Oliveras v.

Astrue, 07 Civ. 2841, 2008 WL 2262618 at *8 (S.D.N.Y. May 30, 2008), report & rec. adopted,

2008 WL 2540816 (S.D.N.Y. June 25, 2008); see also cases cited at page 26-27 above.  Because the

unexplained error in the predicted normal values for Wilson's FEV1 creates an obvious gap in the

record that ALJ Friedman should have developed, remand is appropriate.[34/]

        The Court notes that it may be that because Wilson was able to work through January

29, 2012 (when he retired), that his COPD and other ailments did not render him disabled.  Thus,

on remand it may be that his DIB claim again will be denied.  Nevertheless, the Court cannot sustain

the ALJ's determination on the present record.

## CONCLUSION

        For the reasons set forth above, the Commissioner's motion for judgment on the

---

[34/]    The Court need not address Wilson's other arguments challenging ALJ Friedman's decision. (Dkt. No. 15: Wilson Br. at 16-21.)  Because of ALJ Friedman's legal error in failing to develop the record with respect to the variance in the predicted normal values for Wilson's FEV1 results, the Commissioner necessarily will have to reassess both Wilson's RFC and credibility, particularly since ALJ Friedman relied extensively on the FEV1 results in evaluating Wilson's credibility and weighing the medical opinion evidence (see pages 16-18 above).  Therefore, it is unnecessary to consider whether ALJ Friedman's decision was otherwise supported by substantial evidence.  See, e.g., Ulloa v. Colvin, No. 13 Civ. 4518, 2015 WL 110079 at *15 (S.D.N.Y. Jan. 7, 2015) (""[O]nly after finding that the correct legal standards were applied should the Court consider the substantiality of the evidence.'");  Jackson v. Colvin, 13 Civ. 5655, 2014 WL 4695080 at *21 (S.D.N.Y. Sept. 3, 2014) ("Given that the Court recommends remand for further development of the record, the Commissioner will be required to reassess both [plaintiff's] credibility and [his] RFC in light of the new evidence.");  Serrano v. Colvin, 12 Civ. 7485, 2014 WL 197677 at *18 (S.D.N.Y. Jan. 17, 2014);  Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 331 (S.D.N.Y. 2010) ("Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.")

35

pleadings (Dkt. No. 18) is <u>DENIED</u>, and Wilson's motion for judgment on the pleadings (Dkt. No.

14) is <u>GRANTED</u> to the extent of remanding the case to the Commissioner for further proceedings

consistent with this Opinion.

                SO ORDERED.

Dated:         New York, New York
               June 2, 2015

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:  All Counsel